# UNITED STATES DISTRICT COURT
## District of Kansas
### (Wichita Docket)

**UNITED STATES OF AMERICA,**

           **Plaintiff,**

      **v.**                    **CASE NO. 23-cr-10042-01,02-JWB**

**REGAN J. RINER**
**and ARAM F. VELO,**

           **Defendants.**

## EXPERT DISCLOSURE

**I.**      **DEA Special Agent Erik Brown**

**Opinion:** Agent Brown will testify he assisted in the investigation of these cases and he will provide testimony concerning his actions in support of this investigation. In addition, DEA Special Erik Brown has reviewed reports prepared by other investigators and he has reviewed evidence gathered in this investigation to form opinions, based on the training and experience detailed in his report. These opinions include, but are not limited to, the following: the manner in which controlled substances are distributed to Kansas and in Kansas; the type of controlled substances distributed in Wichita, Kansas; the manner in which

controlled substances are distributed in Wichita, Kansas; the prices controlled

substances are sold for in Wichita, Kansas, and the tools and equipment used;

terminology and coded language used in connection with the Wichita drug trade,

as well as additional opinions contained in his report.

**b.**    **Bases and Reasons for the Opinion:**    The agent's expert report, which

contains the bases for his opinions, is attached to this disclosure and incorporated

herein.

**c.**    **Qualifications:** The agent's Curriculum Vitae is attached hereto and

incorporated herein.

**d.**    **Previous Publications:** None

**e.**    **Previous Expert Testimony:**

*June, 2016 - Case No. 6:15-CR-10009-EFM, United States v. Filiberto Escobedo-Colon.*    Agent Brown provided testimony on how drug dealers used the telephone to make arrangements for the distribution of drugs from Colorado to Kansas; how drugs are trafficked between states; how the value and price of the drugs changes depending on the area of the country and how it was determined that the amount of drugs involved in this case were intended for further distribution.

I, DEA Special Agent Erik Brown, have read and approved this disclosure.

ERIK BROWN

Digitally signed by ERIK BROWN
Date: 2024.03.28 10:12:00 -05'00'

_____

ERIK BROWN
DEA Special Agent

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney

/s/ Lanny D. Welch
LANNY D. WELCH, #13267
Assistant United States Attorney
United States Attorney's Office
301 N. Main, Suite 1200
Wichita, Kansas 67202
316-269-6481
Lanny.Welch@usdoj.gov


**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of March, 2024, I electronically filed the

foregoing Disclosure with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to all counsel of record.


/s/ Lanny D. Welch
LANNY D. WELCH
Assistant U.S. Attorney

3

## Qualifications and Expected Testimony of

## Drug Enforcement Administration (DEA)

## Special Agent Erik Brown

1. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since February, 2009. I was assigned to the DEA Garden City, Kansas Resident Office from March, 2009 through December, 2016. I was assigned to the DEA Fort Worth, Texas District Office from December, 2016 through October, 2019. I was then assigned to the DEA Garden City, Kansas Post of Duty on October, 2019 where I am currently assigned. I attended the DEA Training Academy at Quantico, Virginia from September, 2008 to February, 2009, where I received specialized training in narcotics and money laundering investigations. I have since received training in complex conspiracy investigations, telecommunications exploitation and asset forfeiture. Prior to joining the DEA, I was a police officer with the Arlington, Texas Police Department for over six years. I also have an undergraduate degree in Finance/Economics.

3. During my tenure in law enforcement, I have participated in hundreds of investigations into the transportation, possession, manufacture, and distribution of controlled substances, as well as the laundering of drug proceeds; and the associated conspiracies. These investigations have involved local, regional, national, and international criminal groups. Many of these investigations have resulted in the arrest and conviction of several defendants for state and federal drug trafficking violations. During these investigations I

2

have employed a variety of investigative techniques to include conducting surveillance, buying drugs using undercover law enforcement officers and confidential sources, authoring and executing search warrants for physical locations and electronic devices, conducting searches of premises and vehicles, and interviewing confidential sources, cooperating defendants, and other law enforcement officers that have personal knowledge of drug and money laundering activities.

4. I also have training and personal experience in the authorized interception and monitoring of wire and electronic communications related to drug trafficking. As such, I have become familiar with the many methods and modes drug traffickers use to communicate about their illegal activities to include the use of cellular telephones with voice and text capabilities. For instance, cellular telephones are frequently used by drug traffickers to verbally and textually communicate various types of information with organization members, such as: (a) telephone numbers of co-conspirators; (b) the identities of co-conspirators involved in the drug trafficking enterprise; (c) locations of meetings with co-conspirators; (d) prices and quantities of controlled substances; (e) financial account numbers and other business information related to money laundering and (e) alerts or warnings of the presence of law enforcement.

5. Due to my education, training, and extensive experience, I have testified in federal court as an expert witness, provided formal and informal training to other narcotics officers, been assigned to train new DEA personnel, and been an acting DEA supervisor which has included approving written reports and monitoring field activities and enforcement operations.

6. Through my training and experience I am aware that drug traffickers and money launderers frequently attempt to stymie the investigative efforts of law enforcement. Specifically, drug traffickers and money launderers often utilize hidden compartments in

vehicles, utilize concealments for drugs, use counter surveillance, and utilize fictitious names or the names of others when obtaining telephone service, registering vehicles, and completing financial transactions. Drug traffickers and money launderers also often change telephones/telephone numbers on a regular basis, change transportation routes utilized by couriers, change vehicles and residences regularly, establish false businesses to act as a cover for their illegal activity, and use terminology and coded language regarding drug trafficking and money laundering activities that is intended to disguise the true nature of their communications.

7. I am aware that individual criminal organizations typically utilize terminology and coded language that is specific to their organization. I have also learned that traffickers don't always utilize the same terminology and coded language with all of the members of their organization. In deciphering coded language I utilize my training and experience in conjunction with the context of the communication, and the context of the investigation. Through my training and experience I am aware of the standard units of measure for various types of drugs, and the prices for those drug units in various areas of the country. I have also learned through my training and experience that frequently there is a series of telephone calls between traffickers when speaking about a drug transaction utilizing coded language. It has been my experience that often the code words do not fit the context of the conversation. Coded words often describe the type, quantity, and/or quality of a specific drug. In addition, various coded terminology is used to describe other facets of the illicit business such as currency and firearms.

8. I am aware that the technology being employed by criminal organizations is ever changing and evolving in order to circumvent detection by law enforcement agencies throughout the world. Criminal organizations not only routinely change telephone numbers, intentionally fabricate subscriber information, or utilize prepaid cellular

telephones where minimal information is required, but they also routinely employ the use of various encrypted communication applications to include WhatsApp, Signal, and other encrypted communication applications. These applications prove extremely difficult, if not impossible in some cases, for law enforcement to monitor, track, and or counter during criminal investigations. In addition, these organizations also communicate via instant messaging via various social media applications such as Facebook Messenger.

9. I am aware that individuals within organizations are typically allowed certain access to other individuals involved in the organization.  This is typically due to the intentional compartmentalization that organizations employ in order to insulate high ranking members from law enforcement detection.   Often prospective purchasers of drugs and/or associates who wish to purchase larger quantities of drugs must utilize another member with access to a source of supply in order to obtain a larger quantity of drugs.  Individuals involved in the organization often require that new or prospective customers be vetted by another member of the organization prior to conducting a future transaction.  Criminal associates engaged in a drug conspiracy also may have differing access to prospective customers. For example, if one co-conspirator has drugs on hand to distribute, but has no prospective buyers, he/she may seek the assistance of the co-conspirator if that individual has access to prospective customers. There is a mutual benefit to both criminal associates which allows the enterprise to continue.

10. Based on my training and experience in conducting drug investigations, making arrests of drug traffickers, executing search warrants of drug traffickers' dwellings and conveyances, and conducting interviews of drug traffickers, I am aware that drug traffickers often possess weapons, typically firearms, on their persons or in close proximity as a means to protect themselves and their illicit trade.   Drug traffickers typically refer to their distribution of illicit narcotics as a "business". This criminal

enterprise relies on a product (illicit narcotic) which is in high demand and has a large profit margin. The drug trafficker often is utilizing U.S. Currency to purchase illicit narcotics in order to then distribute the narcotics in a manner which allows the trafficker to make a substantial profit. During the whole endeavor, every portion of the drug trafficking enterprise is under threat of not only law enforcement, but other criminal organizations. Unlike legitimate businesses, drug traffickers cannot purchase insurance or report "losses" of product to law enforcement. Therefore, drug traffickers often utilize firearms to protect themselves and their business from theft, robbery, and loss as this directly effects the profit margin. Due to the value of the drugs, drug traffickers often fear robbery or theft and thus utilize firearms as a means to protect their drugs in order to continue operating their illicit business. In some cases, traffickers are provided drugs to sell from a source of supply without having paid for the drugs in advance. This is referred to as "fronting". Drug traffickers whom owe money to a source of supply are reliant on distributing those drugs in order to not only make a profit, but to pay back the source from which they received the drugs. Failure to do so can place themselves not only in jeopardy of not being provided drugs to distribute in the future, but physical harm from the source of the drugs. Due to many drug traffickers and other individuals engaged in criminal activity having a criminal history which would preclude them from owning a firearm legally, many purchase firearms illicitly through other criminal associates and organizations to remain undetected by law enforcement. These firearms are typically acquired through other criminal activities such as robbery, residential and commercial burglary, theft, and through the use of legitimate purchasers who in turn knowingly or unknowingly sell the firearm to an individual who is legally not allowed to own the firearm.  In addition, firearms are often trafficked as piece of property utilized to trade for a quantity of drugs. Traffickers whom may be ineligible to purchase a firearm

legitimately may utilize a drug transaction to acquire a firearm by trading a quantity of drugs for the firearm(s).

11. Based upon my training, experience, communications with other law enforcement personnel, and interviews of numerous drug offenders, I am aware that the price of drugs in one area of the country may differ from the price of the same quantity of drugs in another area of the country.  As most illicit drugs originate in Latin America and Asia, the areas of the United States that are closest to Latin America and Asia, such as South Florida, the Southwest Border of the United States, and California typically have lower drug prices.  Drug trafficking organizations often use couriers, sometimes referred to as mules, to transport drugs.  Couriers are members of the organization whom have little access, however, are entrusted with the transportation of large quantities of drugs across the United States. Organizations utilize couriers as a means to further insulate themselves from law enforcement detection. A courier will utilize his or her own vehicle or rental vehicle which is not in any way connected to the organizational members whom are directing the shipment of drugs. Although couriers take on a risk of detection from law enforcement, they are typically paid a large amount of money, relative to their time, if they complete the delivery of the drugs. Often these couriers are paid based on the quantity of drug they are transporting. For example, a distributor would pay a dollar amount per pound or kilogram of a substance being transported.  In an attempt to increase their chances of a successful delivery, couriers will employ various methods to conceal their actual travel itinerary. Couriers will pay additional persons to accompany them on the trip to appear more like individuals in a relationship and even utilize small children to assist in the illusion of a family trip. Couriers utilizing a companion also allows for a second individual to operate the load vehicle which in turn means the drugs arrive at the destination much faster and without prolonged stops. Couriers will sometimes wear

specific uniforms such as military uniforms, in hopes of leniency and/or no detection when encountered by law enforcement. Once the couriers transport the drugs from their source areas within the United States to other locations within the United States, such as Kansas, the value and price of the drugs increase. In addition, larger metropolitan locations throughout the United States often act as "hubs" or transshipment points. These points are central locations which allow access to a particular region of the country for the organization. Typically, the drug prices in these areas are often lower than the prices of the same drugs from the same organization at the farthest reaches of that region. Meaning, as the organization moves the drugs farther away from the "hub", the price of the drugs often rises as cost and risk to transport greater distances increases exponentially.  A result of the greater risk involved in the traditional means of transportation, i.e. automobile, bus, train or plane, drug trafficking organizations have also employed the use of parcel carrier services such as U.S. Postal Service, United Parcel Service, and Federal Express. Utilizing these types of transportation services also allow a way for those involved in drug trafficking to avoid detection. The trafficker can utilize another individual to ship the illicit parcel. That individual can use fictitious names and addresses for the return address or sender which cannot be traced back to themselves by law enforcement. These parcels are typically paid for in cash (U.S. Currency). Cash payments allow no further means of identifying the individual who participated in the transaction since there is no account information available to further identify. In addition, many of the facilities which can be used by the individual shipping the parcel are not equipped with any surveillance equipment that can be accessed post seizure by law enforcement. In some cases, as another layer of disguise, the parcel could be going to a disinterested address or another individual whom would not have any direct affiliation to the drug trafficking itself making it difficult for law enforcement to identify other

members involved in the trafficking scheme. In terms of a post seizure investigation, communication of parcel tracking numbers can be passed through many layers of individuals via the use of encrypted communications through various cellular telephone applications which are not easily identifiable by law enforcement.

12. I am aware, after conducting drug investigations, debriefing confidential informants, and conducting interviews of defendants, that there is a reference within the drug business related to individuals being referred to as "users" and "dealers". These terms are often used to describe whether the individual is engaged in drug trafficking (dealers) or a consumer (user). A "user" is also typically referred to as a "customer" due to the fact that they will typically purchase narcotics for personal use or consumption. A "user" is not typically involved in the large scale distribution of narcotics and typically has no direct connection to a large Source of Supply. Although the "user" can be involved in the retail distribution of small quantities of narcotics, typically it is in support of their habit. A "user" can not only purchase narcotics directly from a "dealer", but can utilize other forms of payment to include trading in property or performing various tasks for the "dealer" which can assist the dealer in avoiding detection from law enforcement of whatever criminal activity in which they may be involved. "Users" are not typically trusted with extremely large amounts of U.S. Currency or narcotics, however, there are exceptions.    "Dealers" are often involved in the various facets of drug trafficking in order to facilitate their distribution activities. This may include a direct connection to a larger supplier of narcotics, the logistical mechanisms of the transportation of narcotics and narcotics proceeds, access to couriers and transporters, and the negotiations surrounding the price, quantity, and movement of illicit narcotics and/or drug proceeds. As it relates specifically to the quantities of narcotics in the possession of individuals, there is a distinct difference in a "user" quantity of a drug which is in the possession of an

individual and a "distribution" quantity of a drug. An individual whom is participating in the "use" of a narcotic, does not typically possess much more of the drug than what can be consumed over a short period of time. These quantities can vary to some degree based on that individual's volume of use, tolerance to a specific drug, access to a specific drug, and shear economics, meaning what that individual can afford to purchase at a given time.  Large quantities of drugs, often measured in terms of ounces, pounds, and kilograms, are encountered by law enforcement during the distribution process. These processes can be the manufacturing process, importation, transshipment or transportation, storage, wholesale distribution, and retail distribution. In addition, the weight or quantity of a drug is not always an indication of "distribution" as other factors may apply. Items present to include, drug packaging, measuring scales, cutting agents utilized to increase the quantity of a drug, ledgers, fabricated or natural implements to disguise the transportation of or to store quantities of drugs, and large quantities of drug precursors for a drug's manufacturing process can also be indictors.   In addition, "dealers" who are engaged in "retail distribution" typically possess smaller quantities of a drug due to the need for quantities which are consistent with their customer base. I am familiar with retail drug distributors who sell methamphetamine and other illicit drug quantities by half gram, gram, "teener" (1.75 grams), and "eight ball" (3.5 gram) amounts. Retail distributors are not typically in possession of large amounts of drugs, however, they are still engaged in drug distribution to a customer base which is dependent on smaller quantities per transaction. Retail distribution does allow for a larger profit margin as often retail distributors can charge more for less quantities of a substance. A retail distributor can then conduct smaller quantity transactions and thus increase their overall profit margin. However, retail distribution often does increase the frequency of transactions and can bring an increased risk of detection by law enforcement.

13. I am familiar with the investigation of Regan RINER and Abram VELO and the circumstances surrounding their arrest, the seizure of approximately 1,400 grams of methamphetamine, approximately 58 fentanyl pills, two (2) firearms, and their subsequent indictment in the District of Kansas, Wichita Division. During the investigation by the Kansas Highway Patrol (KHP) subsequent the traffic stop, KHP located on the vehicle floor on the passenger side an object that appeared to be a book, but was later found to be hallow with a void inside. The book safe was locked. This object is known as a "diversion safe". A diversion safe is an object which resembles a normal item, but contains an interior void which can be used to store valuables. I have seen these types of safes in many forms to include books, soft drink cans, detergent bottles, cleaning product bottles, and car product containers to name a few. These diversion safes are sold at retail stores and online as a means to safe guard valuables. I am familiar with these safes being utilized to store illicit drugs from the detection of not only law enforcement, but to aid the trafficker in the concealment of illicit drugs from other individuals who may take the illicit drugs without their consent. Many of these diversion safes are equipped with a lock of some type typically a combination style or key access. In addition, a loaded firearm was located under the passenger seat where VELO was positioned. Two additional locked safes were located in the vehicle (large safe and a red safe) along with cellular telephones belonging to RINER and VELO.

14. Pursuant to a lawful search warrant executed on the book safe, red safe and large safe, quantities of illicit drugs, packaging materials, scales, and an additional firearm were located. Within the book safe, approximately 1.2 ounces of methamphetamine contained within a plastic bag along with approximately 25 blue round pills marked and represented as oxycodone 30mg were located. The blue oval pills were in fact counterfeit pills which contained fentanyl. Both substances were identified by the Kansas Bureau of

Investigation (KBI) Laboratory during analysis. Within the red safe, a plastic bag containing methamphetamine, additional pharmaceutical pills to include Xanax, approximately 25 blue round pills marked and represented as oxycodone 30mg, empty small packaging baggies, and hypodermic needles were located. The blue oval pills were in fact counterfeit pills which contained fentanyl. The substances were identified by the Kansas Bureau of Investigation (KBI) Laboratory during analysis. Within the large safe, two (2) large plastic bags containing methamphetamine, approximately seven (7) additional plastic bags containing methamphetamine which varied in weight, two digital scales, empty small packaging baggies, and an additional firearm were located. These substances were identified by the Kansas Bureau of Investigation (KBI) Laboratory during analysis.

15. I am familiar with the use of fake prescription pills being distributed by drug traffickers. These fake prescription pills are mass produced by criminal drug networks and falsely marketed as legitimate prescription pills. Drug traffickers (dealers) obtain these pills in large quantities which are often produced in Mexico in large clandestine laboratories and illicitly imported into the United States through the southwest border. These large quantities are distributed to various interior U.S. Sources of Supply associated to transnational criminal networks or cartels. These networks move these illicit drugs in the same manner as other types of drugs throughout the United States. These pills are also easily accessible being sold via social media and e-commerce platforms and often marketed to younger people. Although fake pills can be made to look like legitimate prescription opioids like hydrocodone (Vicodin) and alprazolam (Xanax) and stimulants like amphetamines (Adderall), they often contain fentanyl or methamphetamine. In this specific case, the blue oval pills displayed the markings of the prescription pill oxycodone 30mg, however, these pills contained the substance fentanyl. Fentanyl is a

synthetic opioid which is most commonly found in fake pills and the primary driver in the increase of poisoning deaths in the U.S. DEA laboratory testing has found that 6 out of every 10 pills with fentanyl contain a potentially lethal dose.  These pills are commonly sold in dosage units or by the pill. In southwest Kansas, the retail cost of one fentanyl pill is approximately $15 to $20. This is in comparison to a retail cost in Wichita, Kansas, of approximately $5 to $10 per pill. In the southwest border region of the United States, purchases of bulk amounts of fentanyl pills, which would be amounts in the multiple 1,000, are approximately $.50 to $.80 per pill. In southwest Kansas, the retail cost of one ounce (28g) of methamphetamine is approximately $300 to $400. This is in comparison to a retail cost in Wichita, Kansas, of approximately $150 o $200 per ounce of methamphetamine. Wichita, Kansas, is a populous transshipment point (hub) for illicit drugs. I know it is common for drug traffickers to obtain illicit drugs in larger quantities in geographic locations which afford a lower price for the drugs. This allows the distributor to then take that quantity of drugs, which were obtained at a significantly cheaper price, and resell (distribute) those illicit drugs at a higher price and thus increase the overall profit margin.

16. In summation of the substances located within the safes in the vehicle, I believe these illicit drugs were distribution quantities. Methamphetamine can be smoked, snorted, swallowed and/or injected. Methamphetamine can be in powder, base, ice (crystallized), or pill form. A typical dose of methamphetamine is .1 grams up to a half a gram (.5 grams) of a lower purity taken once or twice daily. The amount of methamphetamine seized in the possession of RINER and VELO (approx. 1,400 grams) would not be an amount in which an individual user could consume in any normal or even extreme circumstances over a period of several years. The methamphetamine was packed with a bulk amount of the substance contained within two large plastic bags. Additional plastic

bags were then packaged containing varying weights of methamphetamine. This is typical of a distribution operation whereas the dealer(s) weigh the substance for the customers and maintain amounts on hand for distribution. As the amounts are distributed, the dealer(s) would then return to the bulk quantity of methamphetamine and weigh out additional quantities to fulfill those additional transactions. Scales, which were located with the methamphetamine, indicates that RINER and VELO had the ability to weigh the substance in order to fulfill the requested quantity of methamphetamine negotiated for the specific price to conduct the transaction. Scales are the most common method used by drug distributors to weigh a substance in crystal or powder form in order to achieve the desired quantity requested by the customer. As previously stated, the substance's value is important to the drug distributor and therefore, it is highly important for the distributor to be accurate with the amount they are distributing in order to maximize their profit margin.  In addition to facilitating an accurate measure of the substance, a means to transport the substance and ultimately complete the distribution transaction is necessary. Drug traffickers utilize various types and sizes of packaging material to hold, transport, and distribute illicit drugs. Often times packaging materials are reflective of the quantity of substance being packaged. In terms of retail drug distributors, varying sizes of zip-lock style bags are often utilized to hold the illicit substance when the substance is in an unstable form such as crystal, powder, or vegetative material. These packaging materials allow the drug distributor to package a specific amount of illicit substance securely for inventory, transport, and ultimately distribution. The packaging material locked in the possession of RINER and VELO are consistent with packaging utilized by drug traffickers to distribute methamphetamine. The illicit drugs were safe guarded by RINER and VELO in locked safes. This is indicative of the value placed on the substances by RINER and VELO along with the lengths to which RINER and VELO went to keep the

illicit substances secure. In addition, approximately $3,000 in U.S. Currency was also located within the safe. Drug proceeds are vital to a drug trafficker. These proceeds represent the money gained from the sale(s) of the illicit substance(s). This money can represent profit to be utilized by the drug distributor for a multitude of endeavors. The drug distributor can use this money for personal expenses, future investment in additional illicit substances for resale, or to facilitate a payment for a balance which may be owed to a Source of Supply for illicit substances provided. As detailed previously, firearms are often possessed by the dealer(s) to protect themselves, quantities of the illicit substance, and any proceeds, from robbery or theft. This is due to the monetary value placed on the substance, the profit potential present for the dealer(s) in possession of the substance, and any drug proceeds amassed from its sale. These previously detailed methods utilized by RINER and VELO to secure the substances, packaging, scales, and proceeds display their need to maintain and further their drug distribution activities.

17. RINER and VELO possessed several types of illicit drugs for distribution. I know this to be commonly referred to as "poly-drug" distribution. A poly-drug distributor is a drug distributor who engages in the distribution of more than one principle drug. A poly-drug distributor has the ability to distribute to a larger segment of purchasers who may request one individual type or both types of illicit narcotics. In this case, the presence of methamphetamine, fentanyl pills and other apparent pharmaceutical pills is indicative of poly-drug distribution.

18. Pursuant to a lawful search warrant executed on telephones belonging to RINER and VELO, data was extracted from both telephones. A review of RINER's data indicated that RINER's device was wiped of data by a factory reset while in custody in the rear of the KHP vehicle. The only data present on the device was after the device reset while in RINER's possession under arrest. I have reviewed the contents of drug traffickers'

cellular telephones pursuant to a lawful search warrant or via consent during drug investigations in which I have participated. In most, if not all, of my drug trafficking investigations the contents of cellular telephones often reveal details relevant to an individual's involvement in drug trafficking. The device can contain text messages specific to drug trafficking to include quantities of drugs, prices, meeting locations, identities of other co-conspirators, financial information specific to drug trafficking transactions, images, and videos. In addition, the device can display other applications which may be used by the drug trafficker to communicate with co-conspirators and those specific communications. The deletion of data from her device indicates that RINER's device potentially contained evidence related to her drug trafficking involvement with VELO and beyond. As detailed below, the context of RINER's messages in communication with VELO prior to leaving Wichita and arriving in Garden City indicate that RINER was involved in drug distribution in Wichita, Kansas, or beyond prior to making the trip to Garden City, Kansas. Data associated RINER's drug distribution with VELO and others would presumably be in that data.

19. A review of VELO's data revealed RINER's interactions with VELO and VELO's interactions with other individuals. In a series of messages between VELO and RINER on March 11, 2023, VELO asked RINER if she wanted to go to "garden" to make some money. "Garden" is a common reference for Garden City, Kansas. In addition, the context indicated that VELO has a customer(s) in Garden City, Kansas. RINER asked VELO, "So how much money is in it for me? Because I'm not doing this for free". VELO responded, "Look your going to make money too I share the wealth I ain't never greedy I promise you that". VELO continued, "Asap faster get there the better we make money for both of us I would never leave you out I get paid you will also get paid okay". I am aware how individuals conspire together to distribute illicit narcotics. These individuals will

utilize each other to further their drug trafficking distribution for many reasons. Some include, an individual's access to more customers, perceived safety in having another individual present and participating in drug transactions, access to a larger quantity in which the other individual doesn't have such access, and as a cover passenger in the transportation of illicit drugs over a larger distance. RINER explained to VELO, "I'm trying to hurry but I also have to help my homeboy move shit I made him a promise I'm almost done". I am familiar with coded language or slang terms utilized in communications regarding drug trafficking. I recognize the term "move shit" as a reference to distributing illicit substances and RINER's statement indicated that she is distributing for some other individual at the time VELO wants her to travel with him. RINER continued, "And those blues ain't as good". I know that "blues" is a slang reference for fentanyl pills resembling the oxycodone 30mg blue oval pill. VELO replied, "Take your time I got some other ones if you like the ones I got. We can trade okay". This statement indicates that VELO is also in possession of a substance similar or the same as the "blues" RINER described. RINER advised VELO, "I've been super busy today I still have 2 more stops to make before I can go anywhere". RINER's reference to "stops" is indicative of movements surrounding her drug trafficking she previously described as moving "shit". On March 12, 2023, RINER appeared to be ready to leave for Garden City, Kansas. RINER asked VELO, "He (sp) many you got?", believed to "How". VELO responded, "Close to four and of the candy 260". I believe the "four" quantity is in reference to 4 lbs. of methamphetamine. The term "candy" is a common slang reference for fentanyl pills and I believe VELO is advising RINER that he possesses 260 pills. On March 15th and 16th, VELO is communicating with an individual known by DEA to be a retail methamphetamine and fentanyl distributor in Garden City, Kansas. A review of text messages between VELO and this individual indicated that

VELO was distributing methamphetamine and fentanyl pills to this individual while in Garden City, Kansas. On March 15, 2023, a message was sent to VELO from the individual in Spanish and translated to English. The individual asked VELO for 25 fentanyl pills ("Necito 25 blues"). The term "Necito" is a shortened Spanish word for "Necesito" which means "need". VELO advised the individual, "This are 10 a pop homie the last ones". This indicated that VELO was selling fentanyl pills for $10 per pill and that these pills were the remaining amount he (VELO) and RINER had left to distribute. On March 16, 2023, the individual asked VELO, "Necito 5 asules". The messages were in Spanish, but translated to English. The Spanish word for blue is "azul". I recognize "asules" as a plural of the Spanish word "azul" to mean "blues". The individual is asking VELO for "5 blues". VELO advised the individual to "come get them". Another message from the same individual to VELO, "Necesito una zip de hale". The message was translated from Spanish to English. The term "zip" is an English slang term in drug trafficking meaning an ounce quantity of a substance. The term "hale" is a slang term to reference methamphetamine. VELO also made reference to a "black jeep" in the hotel parking lot as a meeting point for the drug transaction. RINER and VELO would be later occupying a black Jeep Liberty registered to RINER upon their arrest on March 16, 2023. The conversations also revealed VELO providing the location and room number in which VELO and RINER were staying at the hotel in Garden City, Kansas, and conducting drug transactions as VELO directed an individual to "The Town place suites Marriott" and "Room 425". While conducting drug transactions out of a hotel room, the distributor would may be faced with allowing individuals into the specific hotel room to conduct the drug transactions. In addition, the drug distributor would at times be leaving the hotel room for various reasons and not typically traveling with their larger bulk quantities of the illicit substance. It would necessary for RINER and VELO to have the ability to

secure any illicit drugs or proceeds derived from those transactions in a secure location. The safes allowed RINER and VELO to maintain security of the drugs while present conducting transactions within the room and when away from the room for any reason.

20. Although the data on RINER's device was deleted, based on transfers from Cash App accounts belonging to RINER and VELO, as identified through VELO's data, a total of approximately $650 was transferred from RINER to VELO. In addition, data extracted from VELO's phone also suggested that proceeds were loaded or transferred onto VELO's Cash App balance. Cash App is a mobile payment service which allows users to transfer money to one another using mobile phone applications. Also, users of the applications can deposit actual currency (paper money) onto their Cash App balance at participating retailers or the user can connect a bank account(s) to their Cash App account for the purposes of monetary transfers. This gives the ability of the drug trafficker and customer to conduct the monetary transaction via a cellular telephone. Also, it allows a drug trafficker receiving paper money to load that currency onto their Cash App balance so they don't amass large sums of money which would have to be secured and protected.

21. Based on my knowledge and participation in the investigation of Regan RINER and Abram VELO, I conclude that the defendants were engaged in drug trafficking, specifically possession with intent to distribute a controlled substance in violation of 21 U.S.C. 841 (a)(1) and (b)(1)(A).

## Previous Expert Testimony

| Year | Date | Case | Court | Prosecutor |
|------|------|------|-------|------------|
| 2016 | 06-21-2016 | 6:15CR10009 | DKS (Wichita) | Lanny Welch David Lind |

**Erik N. Brown**
**Special Agent**
**U.S. Drug Enforcement Administration**
**Garden City Post of Duty**

*<u>Education</u>*

- 2000 Graduate, Texas Wesleyan University, BA Finance/Economics – Ft. Worth, TX
- 2002 Graduate, Arlington Police Department Academy Class 24– Arlington, TX
- 2009 Graduate, DEA Agent Academy, Justice Training Center BA 180 – Quantico, VA

*<u>Career/Assignments</u>*

- 2002 to 2005 – Arlington Police Department, Arlington, TX
  - Patrol Division
- 2005 to 2008 – Arlington Police Department, Arlington, TX
  - HEAT Unit – Street Crimes Unit
- 2008 to Present – U. S. Drug Enforcement Administration
  - Ft. Worth Resident Office, February 2009 to March 2009
  - Garden City (KS) Resident Office, March 2009 to December 2016
  - Ft. Worth District Office, December 2016 to October 2019
  - Garden City (KS) Post of Duty (POD), October 2019 to Present

- ❖ 06/2013 to 09/2016 - Member of the Garden City PD/Finney County Sheriff's Office SWAT Team
- ❖ 05/2022 – Member of the DEA Kansas City Special Response Team

*<u>Technical Training</u>*

<u>**Formal Training Academies**</u>

- Arlington Police Department Training Academy (Texas) - 27 weeks of Law Enforcement Training (Texas Commission on Law Enforcement Officer Standards and Education accredited) – Arlington, TX
- DOJ – Drug Enforcement Administration – Basic Agent Training Class 180;  20 weeks of Federal Law Enforcement Training - Quantico, VA

<u>**Narcotics/Investigative Training**</u>

- Calibre Press Street Survival Seminar – 16 Hour 01/2004
- NCTCG Drug Interdiction 03/2004
- Reid and Associates Street Crime Course (Arlington Police Department) 02/2005

- North Texas HIDTA Organized Crime, Terrorism & Theft of Intellectual Property  02/2006
- North Texas HIDTA Marihuana Grow Operations 08/2007
- DEA/EPIC Highway Interdiction 08/28 -08/31/2007
- MCTFT Domestic Drug Interdiction 10/17-10/19/2007
- MCTC Advanced Vehicle Contraband Concealment 03/17-03/18/2007
- MCTFT Criminal Street Gang Investigations 04/21-04/22/2008
- North Texas HIDTA ID Theft and the Drug Connection 08/18/2008
- Kansas Narcotics Officers Association Conference – Topeka, KS 03/15/2010 through 03/18/2010 – 24 hours of Narcotics Training Received
- Kansas Narcotics Officers Association Conference – Wichita, KS 03/14/2011 through 03/17/2011 – 20 hours of Narcotics Training Received
- Clan Lab Technician Certification – BTC 87, Level B 40 hour - 06/2022
- ESF-13/Disaster Response Course - DRC #8, 40+ hour - 05/2023

**Firearms/Tactical Training and Instructor Certifications**

- NCTCG Bombs and Explosives Recognition 02/2005
- Tactical Response Fighting Rifle – 16 Hour - 02/2006
- Taser Certification 12/2006
- 40 Hour Patrol Carbine (AR-15) School/Certification APD
- 80 Hour Basic SWAT School (Arlington Police Department) 04/2007
- Technical Services Group – Surefire Low Light Training 10/13/2010
- Prevention and Response to Suicide Bomber Incidents (PRSBI), Department of Homeland Security (DHS) and New Mexico Tech (Playas, NM), 11/03/14 to 11/07/14
- MCTC Tactical Medicine for High Risk Teams 09/12/16 to 09/14/16
- 80 Hour DEA Special Response Team Certification Course (**SCC-05**) 03/27/17 to 04/07/17 Ft. AP Hill (Army Base) Virginia
- DEA Tactical Raids **Instructor** Certification (06/2011) (80 hrs) (Recertification 08/2015, 06/2019)
- DEA Defensive Tactics **Instructor** Certification (05/2018) (80 hrs) (Recertification 06/2019)
- ASP Tactical Baton **Instructor** (ASP-48862)
- Asymmetric Solutions 5 Day SWAT Course (09/18 to 09/22/23) with DEA KC SRT

**Other Law Enforcement Training and Deployments**

- Basic Police Mountain Bike School - 40 Hour 09/2006
- DEA Field Training Agent Certification (No. 71) 02/2013
- DEA Quick Response Team (QRT) Deployment – ESF13 – Hurricane IRMA 09/2017

***Professional Accomplishments***

- Arlington Police Department (APD) Employee of the Month 12/2003, 04/2005
- APD Life Saving Award 08/2004
- APD Peak Performer Award 12/2003, 03/2004, 08/2004, 04/2005
- Numerous Letters of Commendation received from the Arlington Police Department
- DEA Pistol Expert Award 02/2009
- Acting Resident Agent in Charge for DEA Garden City Resident Office
- Resident Agent in Charge for DEA Garden City Resident Office
- Acting Group Supervisor, Enforcement Group 1, Fort Worth District Office
- Letter of Commendation from US Attorney's Office, Topeka, KS, reference *Operation White Pistol*
- Expert Witness for DEA in the District of Kansas
- DEA Exceptional Performance Award 2009-10, 2011-12, 2012-13, 2013-2014, 2014-2015
- DEA On the Spot Award